## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| GLORIA TAYLOR, individually and as ) <br> Independent Administrator of the ) <br> Estate of STEVEN TAYLOR, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> Officer JOSEPH GARRETT, ) <br> individually and as agent, ) <br> ) <br>     Defendant. ) | Case No. 17-cv-2183 |

### OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Defendants' Motion to Bar Medical Opinions of Drs. Friedlander and Silverman [Doc. 32].

## I.     BACKGROUND

In her Amended Complaint, Plaintiff Gloria Taylor, individually and as Independent Administrator of the Estate of Steven Taylor, Deceased, alleges this case arises out of interference and excessive force used to restrain Steven Taylor, by Defendant Joseph Garrett while employed by former Defendant City of Milford on August 17, 2016, at Steven Taylor's home. (Doc. 20 at 2). The Amended Complaint included several claims against the City of Milford and Defendant Officer Garrett. (Doc. 20, 14-36). However, the sole remaining claim in this case is brought by Plaintiffs under 42 U.S.C. § 1983 against Garrett. (Doc. 57, 1).

In an Opinion and Order entered on December 12, 2019, Judge Bruce granted Defendants' Motion for Summary Judgment. (Doc. 45). Plaintiff filed a Notice of Appeal (Doc. 47), challenging only Judge Bruce's finding that Defendant Garrett was entitled to qualified immunity. (Doc. 56 at 7). Following remand, the parties filed a Joint Status Report stating that they seek rulings on three pretrial motions to bar testimony that were denied as moot by Judge Bruce. (Doc. 57). The case has since been transferred to the undersigned. The Court now considers Defendant's Motion to Bar the Testimony of Joel Silverman, M.D., F.A.C.P., F.C.C.P., and Richard P. Friedlander, M.D., F.A.C.C.

Plaintiff claims Dr. Silverman and Dr. Friedlander are uniquely qualified to provide medical opinions in this case. (Doc. 39 at 1). Dr. Silverman, a board-certified pulmonologist, has practiced medicine since 1975 and was previously board-certified in both critical care and internal medicine. (*Id.*) Dr. Friedlander, a board-certified cardiologist, has practiced medicine since 1973 and served as the Attending Cardiologist at the Flushing Hospital Medical Center and the Long Island Jewish Forest Hills Hospital at the time the motion was filed. (*Id.* at 1-2). Plaintiff alleges Dr. Friedlander has worked with hundreds of patients with cardiac issues derived from many different sources. (*Id.* at 2).

In seeking to exclude Plaintiff's proffered medical experts, Defendant claims Dr. Silverman's testimony must be barred as lacking in sufficient facts and data and not being the product of reliable principles and methods. (Doc. 32 at 3-4). Defendant further alleges Dr. Friedlander's testimony must be barred as outside the area of his expertise and lacking in sufficient facts and data. (*Id.* at 4-5).

II.    **DISCUSSION**

A. **Legal Standards**

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court interpreted an earlier version of Rule 702 and explained that it imposes a special gatekeeping obligation on trial judges with regard to scientific testimony. The district court's "gatekeeping obligation . . . applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see also Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he *Daubert* analysis applies to *all* expert testimony under Rule 702, not just scientific testimony."). While the scientific or technical evidence need not have general acceptance, the district court must ensure that the evidence is relevant and reliable before admitting it. *See Daubert*, 509 U.S. at 588-89; *see also United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (noting that judges act as gatekeepers "to ensure that expert testimony is both relevant and reliable.")

In acting as a gatekeeper, district courts must evaluate: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the

expert's testimony." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021). To be relevant, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Courts consider the reliability of an expert's opinion by making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Anderson v. Raymond Corp.*, 61 F.4th 505, 509 (7th Cir. 2023) (quoting Daubert, 509 U.S. at 592-93). Some factors to consider include: "(1) whether the particular scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community." *Id.* at 109 (internal quotation marks and citations omitted).

Rule 702 requires a flexible inquiry and recognizes that the accuracy of proposed expert testimony can be explored adequately via the normal adversarial process of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Lees*, 714 F.3d at 526 (quoting *Daubert*, 509 U.S. at 596). It is "the soundness and care with which the expert arrived at her opinion" that is the focus of the inquiry and not "the ultimate correctness of the expert's conclusions." *Anderson*, 61 F.4th at 510. Moreover, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).

The fact that a doctor has a "medical degree does not make him qualified to opine on all medical subjects." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). However,

"courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats." *Id.*; *see also Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992) ("The fact that the experts were not licensed hematologists does not mean that they were testifying beyond their area of expertise. Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.")

Expert testimony from a medical doctor may be based on his medical experience and review of medical records including an autopsy report. *See Hall v. Flannery*, 840 F.3d 922, 928 (7th Cir. 2016) ("Dr. Ruge arrived at his conclusions based on his review of the autopsy report; Weekley's medical records, including the MRI and CT scans taken before surgery; Dr. Flannery's operative report, and Dr. Flannery and Dr. Sampath's post-surgery progress notes; and deposition testimony;" he also "relied on his medical experience."); *McCoy*, 593 F.3d at 619 (when exact cause of death cannot be determined, "the jury should hear testimony, backed by accepted medical science, about factors that could have exacerbated her heart condition").

**B. Dr. Silverman's Testimony**

Defendant alleges even Steven Taylor's treating hospitalist, who had access to Taylor's medical records and had personally observed and examined Taylor, was unable to determine whether respiratory or cardiac arrest occurred first and indicated no factors that would lead to the conclusion of asphyxia. Dr. Silverman, without performing any experiments or reviewing any medical literature, draws the conclusion that respiratory

arrest occurred first. He further justifies his opinion by stating Taylor had blood gases with a poor gradient that would be indicative of low oxygen which could have been triggered by Garrett's alleged restraint and sent him into a pulseless electrical activity ("PEA") cardiac arrest. Defendant contends this is an untested principle that does not rely on sufficient facts or data. There is no medical literature that supports this theory and, even if there was, Dr. Silverman did not review it or rely on it in producing his report. Dr. Silverman also did not perform his own study or experiment to prove the principle. Therefore, Defendant argues exclusion under Rule 702 because Dr. Silverman's conclusion is a "hunch" which lacks sufficient facts and data and is not the product of reliable principles and methods. Plaintiff contends Dr. Silverman's opinions are in line with widely accepted data and practices in the field of pulmonology and, given his lengthy experience and the elementary principles of pulmonary medicine, there was no need to conduct his own testing.

Dr. Silverman described his methodology as reviewing medical records using a differential diagnosis—looking at possible explanations for the medical issue, assessing each, and coming to an opinion regarding the more likely than not explanation. Hospital medical records revealed that the co-chief determined Taylor had suffered a PEA arrest. Upon learning of the PEA arrest, Dr. Silverman employed a differential diagnosis for the causes of the PEA arrest. Dr. Silverman noted hypoxia is the most common cause of a reversible PEA arrest. He went through the ten different causes of PEA arrest and excluded those that were ruled out by testing at the hospital. Dr. Silverman reviewed medical records and read the depositions of the treating physicians. Upon reviewing the

medical records, he described factors relating to Taylor's health that he applied to his differential diagnosis to arrive at the final conclusion that his PEA arrest was caused by hypoxia. Taylor was obese, a heavy smoker, and likely had a narrow posterior pharynx. Dr. Silverman opines that Taylor had a PEA arrest of which there are ten possible causes, the most common being hypoxia which is the cause in 40-50% of incidents.

Dr. Silverman explained he did not need to review medical literature or conduct studies to arrive at his opinions. While he did not rely on a specific publication or article to reach his conclusions, he described his review of the causes, differential diagnosis, and other information regarding PEA in "UpToDate," an online medical resource with up-to-date research and article. Dr. Silverman also referred to widely accepted medical research databases such as "PubMed" and "Medline" regarding PEA before reaching his opinions. He reviewed those databases to ensure he was current on the medical issues in the case.

The fact that the treating hospitalist was unable to determine if respiratory or cardiac arrest occurred first and indicated no factors that would lead to the conclusion of asphyxia does not render Dr. Silverman's opinion the product of unreliable principles and methods. Dr. Silverman's opinion is based on his medical experience, a review of medical records, reading depositions, and referring to online medical resources and medical research databases. These types of materials are permissible for an expert to consult. *See Hall*, 840 F.3d at 928; *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) (stating that as long as physicians "adhere to the same standards of intellectual rigor that are demanded in their professional work," the testimony is admissible "even if the particular methods they have used in arriving at their opinion are not yet accepted as

canonical in their branch of the scientific community"). The review of a "cold record," including an autopsy report and medical records along with witness testimony, is an appropriate methodology for a medical expert. *See Gayton*, 593 F.3d at 618. The Court has no basis to exclude the testimony because of Dr. Silverman's methodology.

Defendant next contends that Dr. Silverman's conclusion is nothing more than a "hunch" without any medical support. Defendant cites *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996), wherein the expert was appropriately barred from opining that a nicotine patch worn for three days caused an individual's heart attack when no evidence supported the claim. *Id.* at 319. Defendant also cites *Bradley v. Brown*, 42 F.3d 434 (7th Cir. 1994), wherein the court properly excluded the testimony of two physicians who determined that Multiple Chemical Sensitivity Disorder had caused the plaintiffs' injuries after being exposed to pesticides, when the physicians could not explain why individuals contract chemical sensitivity and offered only speculation. *Id.* at 438. Finally, Defendant relies on *Porter v. Whitehall Labs, Inc.*, 9 F.3d 607 (7th Cir. 1993), wherein the court properly barred the opinions of five physicians that renal failure was caused by ibuprofen. *Id.* at 614-15. Each of the physicians stated that the opinion lacked scientific support, was based on subjective belief alone, was a personal hypothesis, or could not be stated within a reasonable degree of certainty. *Id.*

Dr. Silverman's proposed testimony is not analogous to any of those cases in which the testimony was excluded. Dr. Silverman relied on medical records and data from this case, performed differential diagnosis, and opined within his area of expertise. He based his opinions on his experience with similar issues and common medical issues

and utilized online medical resources and databases as needed. Dr. Silverman's opinion was given to a reasonable degree of medical certainty. For all of these reasons, the Court denies Defendant's motion to the extent it relates to Dr. Silverman's testimony.

### C.  Dr. Friedlander's Opinion

Defendant claims Dr. Friedlander's opinion that respiratory arrest triggered Taylor's cardiac arrest should be excluded because he is not a pulmonologist and failed to rely on sufficient facts and data in reaching his opinions. Defendant alleges that even though Dr. Friedlander believes that respiratory arrest triggered cardiac arrest, Dr. Friedlander did not know what Taylor's oxygen levels were on the date of the incident and did not perform any calculations or experiments to test his theory. Moreover, Dr. Friedlander could not address what level Taylor's breathing would need to be compromised or restrained by Garrett so as to trigger a respiratory arrest. Even though decreased "tidal volume" is a prominent topic of his report, Dr. Friedlander does not provide any calculations as to how much "tidal volume" would have to be restricted to result in respiratory arrest leading to cardiac arrest.

While physicians are not necessarily qualified to offer opinions on all medical subjects, a general practice physician is often deemed qualified to testify about medical issues that specialists typically treat. *See Gayton*, 593 F.3d at 617. Dr. Friedlander testified that while he is a cardiologist, he is board-certified in internal medicine and has a working knowledge of pulmonology. He also testified that as a cardiologist, he is required to understand the pulmonology system's potential to interfere with and cause complications for the cardiovascular system. As a cardiologist, Dr. Friedlander is

qualified to offer an opinion as to the cause of a cardiac event. Given his medical training and experience, the Court concludes Dr. Friedlander is qualified to opine that Taylor's cardiac arrest was triggered by respiratory arrest even though he is not a pulmonologist.

Defendant also alleges Dr. Friedlander's opinion fails to rely on sufficient facts and data. Dr. Friedlander testified he engaged in the process of differential diagnosis, considering possible causes of Steven Taylor's death such as hypoglycemia, respiratory suppression, heart disease, or trauma based on the interaction with Garrett. Defendant contends Dr. Friedlander's lack of knowledge concerning Taylor's oxygen levels renders his methodology unreliable. Plaintiff notes that neither the oxygen levels nor the tidal volume levels Taylor was experiencing at the time of the incident were measured and would be practically impossible to recreate.

Dr. Friedlander analyzed the tidal volume of Taylor and drew conclusions based on the available facts and data, testifying that the tidal volume would have been decreased while Taylor was being pinned down by Garrett. Dr. Friedlander explained that if tidal volume is compromised, then shallow breaths would move in and out of dead space and not provide sufficient oxygen. Defendants' pulmonary expert, Dr. Tom Neuman, agreed that the tidal volume would be decreased though not to the same extent. Dr. Brian Field, one of Taylor's treating physicians, described the hypoxic respiratory failure as "failing to breathe adequately to oxygenate your tissues. The oxygen exchange isn't happening at the lungs." (Doc. 39-7 at 15). Dr. Andrew Zasada described an "air flow obstruction" as "any change in the physical shape of the airway that starts at the vocal cords and ends in the bronchial tubes in the lungs." (Doc. 39-5 at 48). He explained

that if a patient's head bends forward too much, vomit can be swallowed thereby obstructing the airway. Accordingly, Dr. Friedlander's opinion is supported at least to some extent by other physicians.

The Court finds Dr. Friedlander's lack of knowledge concerning the exact levels of oxygen and tidal volume, which are now impossible to measure, does not render his opinions unreliable. Any deficiencies concerning Dr. Friedlander's methodology and conclusions go the weight of his testimony, not its admissibility. His testimony can be challenged by vigorous cross-examination and presentation of contrary evidence.

For the reasons stated herein, Defendants' Motion to Bar Drs. Friedlander and Silverman (Doc. 32) is DENIED.

ENTER: March 18, 2024

FOR THE COURT:

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE